UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF CONNECTICUT

- - - - - - - - - - - - - - - - x

DAVID STEKETEE                    :  No. 3:15-CV-00585(SRU)
                                  :  915 Lafayette Boulevard
            vs.                   :  Bridgeport, Connecticut
                                  :
VIRIDIAN ENERGY, INC.             :  December 2, 2015

- - - - - - - - - - - - - - - - x


MOTION HEARING


B E F O R E:

    THE HONORABLE STEFAN R. UNDERHILL, U. S. D. J.


A P P E A R A N C E S:

    FOR THE PLAINTIFF:

            IZARD NOBEL, LLP
                29 South Main Street
                Suite 305
                West Hartford, Connecticut  06107
            BY:  ROBERT A. IZARD, JR., ESQ.



    FOR THE DEFENDANT:

            VENABLE LLP
                575 7th Street, N.W.
                Washington, D.C.  20004
            BY:  DANIEL S. BLYNN, ESQ.



            Sharon L. Masse, RMR, CRR
             Official Court Reporter
             915 Lafayette Boulevard
          Bridgeport, Connecticut  06604
               Tel: (860)937-4177

1          (Whereupon, the proceedings commenced at 11:48

2    a.m.)

3          THE COURT:  Good morning.  We're here in

4    Steketee v. Viridian.  Can I have appearances, please.

5          MR. IZARD:  Yes, Robert Izard for the plaintiff.

6          MR. BLYNN:  Dan Blynn for the defendant

7    Viridian, and with me is Adam Burns from Viridian.

8          THE COURT:  Very good.  And we're here on the

9    motion to dismiss or, in the alternative, to strike class

10   allegations.  Obviously, the case is familiar to me since

11   we were here before.  Mr. Blynn, do you want to start us

12   off?

13         MR. BLYNN:  Thank you, Your Honor.

14         Good morning, Your Honor, and may it please the

15   Court, as Your Honor recognized we have been here before.

16   In August we were here on a motion to dismiss the original

17   complaint, and as a result of that motion, all claims were

18   dismissed.  The Court allowed plaintiff leave to replead

19   his consumer fraud act claim and his implied covenant

20   claim.

21         The plaintiff filed an amended complaint which

22   made three changes to the original complaint; one, the

23   plaintiff found and replaced the term "market rate" for

24   "wholesale market conditions" to track the language of

25   Viridian's contract that governs his relationship with

1   Viridian; two, there was a new paragraph, paragraph 28,

2   which simply turned into narrative form some data

3   contained in a table in the original complaint, and it's

4   also in the amended complaint; and paragraph 24 is the

5   third new addition to the amended complaint, and in that

6   paragraph the plaintiff claims he had a telephone

7   conversation with a Viridian representative.  We don't

8   know when, we don't know who, and during that conversation

9   the representative explained to the plaintiff that

10   Viridian's variable rate would be based on wholesale

11   market conditions, but the plaintiff enrolled in Viridian

12   because of his belief that electricity prices would fall

13   in the future.  There's nothing more than that, Your

14   Honor.

15         THE COURT:  So we do know when, don't we?

16         MR. BLYNN:  No, we don't, Your Honor.

17         THE COURT:  Well --

18         MR. BLYNN:  We don't know when the conversation

19   took place, and that's a problem --

20         THE COURT:  Well, we know it was March 2014,

21   don't we?  I have to look at the complaint in the light

22   most favorable to the plaintiff and draw reasonable

23   inferences.  So he says he signs up on the basis of the

24   phone call, and he signs up in March of 2014.  So isn't it

25   a reasonable inference that the conversation took place in

1   or about March of 2014?

2           MR. BLYNN:  Your Honor, I'm not -- I'm not sure.

3   And the reason I'm not sure is in other Viridian cases,

4   conversations have preceded enrollments by months or

5   years.  So that's kind of why we have Rule 9(b), to give

6   us some indication of when the conversation took place.

7   This plaintiff has had many conversations with Viridian,

8   but we don't know which conversation he's referring to.

9   If it's the March 24 -- if there's a March 2014

10  conversation, and that's the conversation that he's

11  referring to, then we'll accept it.  It's not sufficiently

12  clear to us at this point.  That's easy to fix, Your

13  Honor, and so I'm not -- I'm not basing our entire motion

14  to dismiss on Rule 9(b).  I think Rule 9(b) can be

15  satisfied if the allegations exist and -- or if the facts

16  exist and the allegations are made in the correct way.

17  But there's more to the      Rule 9(b) problem, and that's

18  the who, and we can turn to that, Your Honor, if you'd

19  like to jump right to      Rule 9(b).

20          THE COURT:  Why isn't the who something that's

21  solely within your possession as opposed to the plaintiff?

22  When I get calls, if they say the name, it's rare, and

23  certainly I don't remember the name.

24          MR. BLYNN:  Well, there's several reasons why it

25  may not be in our possession.  First of all, this is the

1   business model that Viridian sells through.  Viridian

2   sells directly to consumers, or it sells through a network

3   of what's called independent Viridian agents.  It's very

4   much like a Mary Kay or Avon situation.  So this plaintiff

5   may have had a conversation with an IVA, an independent

6   Viridian associate, and we don't have any record of that.

7   We wouldn't have a record of that.

8           THE COURT:  Well, you probably would because

9   isn't that IVA going to receive a commission of some sort

10  for the fact that Mr. Steketee signs up?

11          MR. BLYNN:  The commission is based on the

12  length of time the consumer stays with Viridian.  We don't

13  know how many conversations or who he spoke with.  I mean,

14  this is part of the problem, is we're trying to

15  investigate internally and determine who was party to this

16  conversation and what took place.  And, Your Honor, in the

17  Second Circuit, in the *Mills v. Polar* case, the Court said

18  just referring to defendant or defendant's sales

19  representatives is not sufficient for Rule 9(b) -- Rule

20  9(b) purposes regardless of, you know --

21          THE COURT:  Well, that's a harsh rule if the

22  plaintiff was never told, as presumably the plaintiff was

23  not, who that person is.

24          MR. BLYNN:  The plaintiff doesn't plead that he

25  was not told the rep's name.  In fact, I think that would

1  probably be -- probably be a problem. I think you have to

2  identify your name when you make a --

3          THE COURT: Well, justice doesn't require

4  dismissal of a complaint when the plaintiff is unable to

5  identify the person. 9(b) is intended to put you on

6  notice. You're on notice that a representative of

7  Viridian, who apparently presumably got a commission for

8  this sale, called the plaintiff in or about March of 2014.

9  Why doesn't that satisfy 9(b)?

10          MR. BLYNN: Well, I mean, it would -- it would

11  be, Your Honor, if there were one phone call or it could

12  be traced to one representative.

13          THE COURT: Well, okay. He alleges one phone

14  call.

15          MR. BLYNN: Okay.

16          THE COURT: That's the complaint. It may be

17  that there were more. That's not in the complaint. So I

18  have a complaint that says he got a phone call, and he

19  signs up in March 2014. I put those together, and I draw

20  an inference he got a phone call from a Viridian

21  representative in or about March of 2014. It may not

22  prove to be accurate, but that's not the question right

23  now. The question right now is, is this enough?

24          MR. BLYNN: All right. Your Honor, if that's

25  the ruling and plaintiff is going to be bound to that

1   allegation that it was a Viridian direct representative in

2   2014, then that's fine.

3               THE COURT:  Well --

4               MR. BLYNN:  If it was an IVA, we have a problem,

5   and that's part of the issue here.

6               THE COURT:  Well, a phone representative.

7   You're on notice -- this is not some unidentified

8   conversation.  It may not be perfectly identified, but the

9   question is, are you on notice?  Can you start

10  investigating?  You've indicated you already have started

11  investigating.  So I think you're on notice about the

12  nature of the conversation and who made it sufficient to

13  allow you to investigate and to come back and say, "This

14  never happened."

15              MR. BLYNN:  Okay.

16              THE COURT:  "In fact, he's not even on our list

17  of people that we've ever called," or whatever.

18              So I don't see -- I really don't see a 9(b)

19  problem here.

20              MR. BLYNN:  Okay.  And I'll move away from this,

21  Your Honor.  Again, I don't think Rule 9(b) is going to

22  win the day anyway, but I would say that, you know, in the

23  *Bava v. Hamilton Farm Golf Club* case that we cited in our

24  motion to dismiss, the District of New Jersey on a

25  consumer fraud act claim found that an allegation of one

1   or more representatives of the defendant making the

2   challenging representations was not enough to satisfy

3   Rule 9(b).

4           THE COURT:  But, again, that's not what we have

5   here.  We have, instead, an allegation that a phone

6   representative of defendant, not one or more.  "One or

7   more" is vague.  A hundred representatives is more -- is

8   one or more, so there's no way for the defendant in that

9   case to investigate.  Here we know it was one rep.  We

10  know it was in or about March of 2014.  It seems to me

11  that's enough.

12          MR. BLYNN:  Okay.  And again, Your Honor, I'm

13  not going to press Rule 9(b) anyway.

14          Turning, more importantly, to the consumer fraud

15  act shortcomings, there are three central elements to a

16  New Jersey consumer fraud act claim.  One is a

17  misrepresentation or unlawful conduct by the defendant,

18  two is ascertainable loss by the plaintiff which is

19  quantifiable, and three is, importantly, the causal link

20  between the unlawful conduct or the misrepresentation and

21  the ascertainable loss.  And in August the Court

22  dismissed -- dismissed the claim saying there are some

23  problems with ascertainable loss, and there were problems

24  with the causal link.  The new amended pleading doesn't

25  fix any of those problems.  The ascertainable loss

1   allegations are the exact same from the first amended

2   complaint -- or, I'm sorry, from the original complaint.

3        The ascertainable loss claims are in two

4   paragraphs, paragraphs 32 and 54, and let me just read

5   them for Your Honor, although I'm sure you have the

6   complaint in front of you.  One is the alleged injury is

7   that the plaintiff paid a, quote, variable electric rate

8   that was four or five times underlying market rate, and

9   that's from paragraph 32, and paragraph 54 says the

10  plaintiff and the class were injured when they paid an

11  exorbitant premium for electricity over wholesale market

12  rates.

13       Now as the Court may recall on August 18, it

14  found that ascertainable loss can't be the fact that

15  Viridian charged a variable rate higher than the wholesale

16  market rate.  That's a rate that no one could obtain in

17  their own right, and as the Court said, Viridian's price

18  premium is, quote, irrelevant.

19       Ascertainable loss also can't be the fact that

20  Viridian may have charged a rate higher than a

21  noncompeting brown energy, which is a nongreen,

22  nonrenewable energy product.  It's a fixed rate provided

23  by the utility.  So --

24       THE COURT:  Let me ask you why there isn't set

25  forth in the amended complaint an allegation of

1  ascertainable loss as follows:  I was induced to switch

2  based upon a misrepresentation.  After switching, I paid

3  more than I would have paid but for that

4  misrepresentation, and that's my ascertainable loss.

5         MR. BLYNN:  Actually, Your Honor, that's exactly

6  where I was going.  That is what is required, an

7  allegation that I would have paid less for Viridian's

8  energy had I not received the alleged misrepresentation.

9  But that's not in there.  The two allegations of loss, of

10 injury, are what I just read, that he paid rates -- an

11 exorbitant rate and a rate that was higher than -- four to

12 five times higher than the wholesale market rate.

13        THE COURT:  But when you have that allegation,

14 is a reasonable inference from that allegation that that's

15 a higher rate than I would have paid had I not switched?

16        MR. BLYNN:  But it's not, Your Honor.

17        THE COURT:  Why not?

18        MR. BLYNN:  Here's why.  In the --

19        THE COURT:  Everybody is charging four to five

20 times the wholesale rate?

21        MR. BLYNN:  No; although, Your Honor, there's no

22 allegation in here as to what rate is being paid or being

23 charged for a competing green renewable energy product,

24 and that's exactly the shortcoming that was identified by

25 the Court in the *Stewart* case.  That was the premium milk

1  with omega 3's case.  The Court there said there's no

2  ascertainable loss because although this plaintiff has --

3  although that plaintiff has pleaded the cost of other skim

4  milks, other fat-free or -- I'm sorry, other skim milks

5  with omega 3's, they did not plead a product that included

6  the, I think it was one gram of fat, which was included in

7  the product sold by the defendant; and, therefore, you're

8  missing the comparative product.  You know, you can't say

9  here's what -- here's what the price would have been

10  absent the misrepresentation or the unlawful conduct.  And

11  that's exactly what's missing here, Your Honor.  I think

12  Your Honor just pointed it out precisely.

13          And, further, Your Honor, this --

14          THE COURT:  Well, look at paragraph 38.  In

15  essence it says:  Plaintiff paid Viridian rates that were

16  far in excess of the amount he should have paid if

17  Viridian's rates were based on market conditions.

18          So what he's alleging is:  I was told market

19  conditions.  In fact, that wasn't the deal.  It was a

20  misrepresentation.  And my ascertainable loss is the

21  difference between what I actually paid and the amount

22  that I would have paid had the representation been

23  accurate.  That's an ascertainable loss.

24          MR. BLYNN:  I think that's a real stretch of the

25  complaint; but beyond that, Your Honor, it's not just

1  market conditions.  That's not what our contract says.

2  The contract at issue --

3          THE COURT:  Whatever the contract says, we're

4  talking about ascertainable loss.  You're arguing that he

5  hasn't alleged it.  Why isn't that an allegation?

6          So here we go.  You can buy the stock for a

7  hundred dollars.  In fact, we're going to charge you $150.

8  And I bought the stock.  The difference between what I

9  would have paid had it been an accurate representation and

10 what I actually paid is an ascertainable loss.

11         MR. BLYNN:  And, Your Honor, I think you're

12 right because you can quantify that difference.  The $50

13 is the ascertainable loss.  Here we have what he paid and

14 then some -- something that was in excess of the amount.

15 We don't know what that amount was.  We're dealing with

16 something in the abstract.

17         THE COURT:  No, it's called expert testimony.

18         MR. BLYNN:  Well, Your Honor --

19         THE COURT:  It's called "here's what all the

20 other providers were charging."

21         You know, there's ways to prove it.  He doesn't

22 have to come in and say it was 36 cents per kilowatt hour

23 more than I should have paid.  He has to say there's an

24 ascertainable loss.  He doesn't have to have ascertained

25 it by the time he writes his complaint.  It has to be

1   ascertainable.

2          MR. BLYNN:  You're right, Your Honor.  The real

3   problem that you're going to get to with trying to set a

4   rate is courts can't set public utility rates.  That's the

5   problem.

6          THE COURT:  I don't intend to do that, and I

7   don't think the plaintiff is asking me to do that.  What

8   the plaintiff is doing is saying there's a difference

9   between the rate they charged me and the rate they told me

10  they were going to charge me.

11         MR. BLYNN:  Okay.

12         THE COURT:  That's an ascertainable loss.

13         MR. BLYNN:  All right.  Your Honor, even if

14  there were an ascertainable loss, we're still missing the

15  causal link.  What the Viridian representative told the

16  consumer must have -- told the plaintiff must have been

17  the proximate cause or caused him to enter into the

18  contract.

19         THE COURT:  You're saying he has to have relied

20  on it.

21         MR. BLYNN:  No, I'm not saying that.  Reliance

22  is different.

23         THE COURT:  Yes, it is.  It is.

24         MR. BLYNN:  Reliance is different.  It's not

25  required under the New Jersey Consumer Protection Act.

1          THE COURT:  Right, so how is what you're saying

2     different from reliance?  You're saying he has to have

3     done it.  You didn't use the word "reliance," but that's

4     what you're saying.

5          MR. BLYNN:  Reliance is a type of -- and this

6     comes from the *Hartman* case -- reliance is but for

7     causation.

8          THE COURT:  Right.

9          MR. BLYNN:  Okay?  The causal link that's

10    required under the New Jersey Consumer Protection Act

11    requires a further step in the analysis.  It's a proximate

12    cause.  It's a proximate cause standard.  The plaintiff

13    must prove not only that had he known the truth, he would

14    have acted; but then, in addition, the untruth was in some

15    reasonably direct or proximate way responsible for his

16    loss.

17         THE COURT:  It was a substantial factor in his

18    decision to --

19         MR. BLYNN:  It was a substantial factor.

20         THE COURT:  Right.

21         MR. BLYNN:  He would not have enrolled but --

22    and I'm not going to say "but for" -- he would not have

23    enrolled otherwise.

24         THE COURT:  Right.

25         MR. BLYNN:  Okay?  Your Honor, it's the

1  situation where you're selling an umbrella, and you market

2  it as being made of the finest of materials, but a

3  plaintiff buying -- but an individual is buying the

4  umbrella because he thinks it's going to rain.  If rain

5  comes through that umbrella --

6          THE COURT:  No, no, no.  But if he has a choice

7  of umbrellas, and he bought your umbrella not only to stay

8  dry but because he wanted one made of the finest fabric,

9  then the proximate cause has been satisfied.  That's what

10  we have here.

11          MR. BLYNN:  But, Your Honor --

12          THE COURT:  You can't say that simply because he

13  alleges that he believed wholesale electricity prices were

14  going to fall that there is no causation.  That's one of

15  the factors.  But this doesn't have to be the only factor.

16  It has to be a proximate cause.

17          MR. BLYNN:  Right, Your Honor, but the Viridian

18  representative made no representation about price.  She

19  said wholesale market conditions.  I would agree with you

20  if the representative said wholesale market prices, and

21  the plaintiff bought it --

22          THE COURT:  That's just too fine a slice, isn't

23  it?

24          MR. BLYNN:  No, it's actually not.  That's

25  exactly what's required.

1          THE COURT:  When a consumer is told, Your rate

2    is going to be based upon wholesale market conditions,

3    does any reasonable consumer think that that means

4    anything other than wholesale prices?  What else could it

5    mean?

6          MR. BLYNN:  Well, it can mean -- it can mean --

7          THE COURT:  How can my price be based on a

8    condition in the wholesale market other than the wholesale

9    price?

10          MR. BLYNN:  It's because -- and this is an issue

11   that the plaintiffs have -- this is not -- electricity is

12   not all the same.  Price is not the only material factor.

13   And it's actually -- Your Honor, let me just note that

14   just nine days ago the Federal Trade Commission submitted

15   a comment to the New York Public Service Commission

16   criticizing the Public Service Commission for evaluating

17   electricity market reforms and focusing exclusively on

18   price.  In fact, the FTC said --

19          THE COURT:  Well, okay, but let's get back to

20   this case because are you saying you have high-test

21   electricity and other people have low-test electricity?

22          MR. BLYNN:  We have renewable electricity, and

23   others don't.

24          THE COURT:  Well, it's electricity.

25          MR. BLYNN:  And we have a hundred percent

1  renewable, and others don't.

2        THE COURT:  Well, what you're saying is the

3  manner in which it's created is different.  You're not

4  saying the electricity is different.  Electricity is

5  electricity, right?

6        MR. BLYNN:  Somewhat, Your Honor.  You know,

7  electricity is electricity, but there are other services

8  that supply -- if that were -- if that were the only --

9        THE COURT:  But the statement isn't based upon

10 services or based upon source of electricity; it's on

11 wholesale market conditions.  Wholesale market conditions,

12 whatever the source is, are wholesale market conditions.

13 Right?  And "wholesale market conditions" to a consumer is

14 wholesale market price.

15       MR. BLYNN:  But that makes a leap that

16 "conditions" implies rate or price only.

17       THE COURT:  Why would you say something like

18 that to a consumer other than to suggest that the variable

19 price that the consumer is going to pay is linked to the

20 wholesale price?  What else can the consumer care about in

21 the wholesale market such that you're going to represent

22 that to them?

23       MR. BLYNN:  The cost of wind turbines, the cost

24 of a lot of other things, Your Honor.  It's not just we

25 buy off the grid and that's it.  That's not how this

1  works.

2          THE COURT:  But you didn't say "based upon our

3  price of electricity."  You said "based upon wholesale

4  market conditions."  That's the market.  It's not your

5  cost.

6          You're not saying, for example, We're going to

7  sell it to you for cost plus ten.  That's not what was

8  said.  So if your cost of a wind turbine went up or you

9  bought a bunch of solar panels and your costs go up, it's

10  cost plus ten.  You didn't say that.  You said wholesale

11  market conditions.

12          Whatever your costs may be, the wholesale market

13  is something that a consumer can look at and rely on.  So

14  what I have is an allegation that says wholesale market

15  conditions, not our cost of electricity.

16          MR. BLYNN:  Your Honor, in the *Mason* case, the

17  representation being challenged was that a consumer would

18  pay for a car invoice price plus $500.

19          THE COURT:  Okay.

20          MR. BLYNN:  The plaintiff paid invoice price

21  plus $2,187.  And the Court said, Okay, maybe there's some

22  ascertainable loss there, $1,600.  But the cause of that

23  loss was not the representation; it was the fact that a

24  different price was charged.  It had nothing to do with

25  the representation.  That is this case.

1          THE COURT:  Well --

2          MR. BLYNN:  And --

3          THE COURT:  -- I'm just going to have to

4     disagree with that case, then, because you buy based upon

5     representations.  That's the proximate cause right there.

6     Mr. Steketee isn't going to go with Viridian unless he's

7     told, according to the allegations, wholesale market

8     conditions, so he switches.  That's an act that he's

9     caused to take based upon the representation, and that

10    switch is what caused his loss.  So to the extent that the

11    *Mason* case says something different, I'm just going to

12    have to disagree with it.

13         MR. BLYNN:  I brought it up last time, last time

14    we were here, Your Honor, but it's a New Jersey --

15    District of New Jersey case interpreting New Jersey law.

16         THE COURT:  Right.

17         MR. BLYNN:  Under the Second Circuit's

18    authority -- and I don't have the cites with me, I had

19    them last time, and I could point the Court to where it is

20    in the docket -- this Court essentially has to accept that

21    ruling absent a finding or absent an indication that the

22    New Jersey Supreme Court disagrees with it.

23         THE COURT:  Well, what I have to do is accept

24    binding authority of the state court, which means the

25    supreme court or an appellate court of the state.  I don't

1  have to accept the trial court level at either the state

2  or federal courts interpreting.  It's just not binding,

3  any more than my colleague next door is binding on me on

4  Connecticut law, or the Connecticut superior court is

5  binding on me on Connecticut law.

6          MR. BLYNN:  It's really an issue of comity; but,

7  Your Honor, we've pointed to these cases, we've made the

8  argument before, you don't buy them.  I'll move on.

9          Let me turn to the implied covenant claim.  The

10  plaintiff has conceded, Mr. Steketee has conceded that

11  even though that claim was dismissed in August, he hasn't

12  changed a single one of his complaint allegations.

13          THE COURT:  I'm sorry, which case -- what are

14  you talking about now?

15          MR. BLYNN:  Implied covenant claim.

16          THE COURT:  Right, okay.  The implied covenant

17  claim, that's an interesting one because the transcript

18  that you attached to your motion stopped a page short of

19  where I said that that was a good claim.  That was an

20  interesting omission there.

21          MR. BLYNN:  We've got the full transcript.

22          THE COURT:  Well, I've got it too.  Yes, take a

23  look at page 78.  This is where I said, Well, okay,

24  Viridian may be allowed to charge a large markup, but I

25  think the covenant of good faith and fair dealing argument

1    is a pretty good one when the expectation, the reasonable

2    expectation of the consumer is that it's going to be based

3    upon their costs, and then etc., etc.

4           But the point is I described that claim as a

5    pretty good one.  That page interestingly was omitted from

6    the pages that you submitted along with your brief.

7           MR. BLYNN:  We didn't want to deluge the Court

8    with paper, but -- and that's why, Your Honor.

9           THE COURT:  Well, here's my point.  You're

10   standing up saying nothing has changed.  The reason

11   nothing has changed is because I said that was a pretty

12   good claim.  So I gave them the chance to add any

13   allegations they wanted to, but it's not because it wasn't

14   a pretty good claim first time around.

15          MR. BLYNN:  Your Honor, then let me turn to the

16   actual -- to the argument.  For there to be evidence of

17   bad faith, there has to be intent.  There have to be

18   specific acts showing bad motive or intent.  There has to

19   be a malice-like state of mind.  There has to be what was

20   in *Wilson*, an allegation in the complaint that defendant

21   exercised his contractual price-setting discretion with

22   the specific purpose of driving the plaintiffs out of

23   business.  It has to be like in *Slack* where --

24          THE COURT:  What we have here is a claim that

25   it's four to five times the wholesale rate and exorbitant.

1  Why isn't that bad faith when the plaintiff has signed up

2  based upon a representation that this is going to be based

3  upon wholesale market conditions, and then the rate

4  charged is four to five times that rate?  That's what we

5  call price gouging.  Price gouging, I think, implies bad

6  faith, doesn't it?  If you're charging an outrageous

7  amount of money for something that you've represented

8  you're not going to be charging an outrageous amount for,

9  isn't that --

10        MR. BLYNN:  Actually, Your Honor, again, I don't

11  have the cite, it was in our initial -- I think it was in

12  our initial reply brief in the first round, but under New

13  Jersey law what we've got here isn't price gouging because

14  the amount that Viridian charged, the Viridian price, the

15  difference between, I guess it would be 82 cents, didn't

16  exceed the threshold, so by law it's not price gouging.

17        THE COURT:  By law it's not price gouging, and

18  we don't have a price gouging claim.  I think I prefaced

19  my remarks by saying it's like price gouging.  It may not

20  officially get there, but that's the same concept that's

21  alleged in the complaint.

22        MR. BLYNN:  But that's a concept that failed in

23  *Faistl* and *Slack 1*.  That's the exact concept.  If you

24  were to match up the complaints from the three cases, they

25  would -- they would overlap.  What happened in *Faistl* is a

1    breach of implied covenant claim was dismissed, even

2    though there were allegations that the defendant, quote

3    unquote, jacked its rate 300 percent higher --

4              THE COURT:  Right.

5              MR. BLYNN:   -- than the prevailing market rate.

6    And in *Slack 1*, there was the same allegation; the

7    defendant -- the defendant raised its rates I think two

8    and a half times the market rate.  What you need here --

9    and those cases didn't survive.  The only reason *Slack*

10   survived on amended pleading is because there was a new

11   allegation that went unopposed, and the new allegation was

12   the plaintiffs complained to the defendant and got after

13   the price -- after-the-fact price reductions.

14             THE COURT:  Right.

15             MR. BLYNN:  And in *Wilson*, the intent was to

16   drive the individuals out of business.  And in *Brunswick*

17   *Hills*, the New Jersey Supreme Court case, the facts showed

18   that for 19 months the defendant refused to respond to the

19   plaintiff's inquiries to set a date for closing on a lease

20   renewal; and there, as the Court said, there was a pattern

21   of gamesmanship, an artful dodging and studied silence.

22   But even in that case, Your Honor, in *Brunswick Hills*, the

23   Court said you can't -- you can't plead implied covenant

24   in the abstract.  It's not a catch-all claim.  There has

25   to be a malice-like state of mind.  You have to show that

1 defendant, that Viridian intended to bankrupt or to cause

2 this plaintiff financial harm, and you don't have that

3 here.

4 THE COURT: No.

5 MR. BLYNN: You have an allegation that rates

6 rose four to five -- three to four times higher than this

7 rate that no other consumer in the world could get.

8 THE COURT: There's no allegation that Viridian

9 intended to cause the plaintiff financial harm?

10 MR. BLYNN: There's no factual allegation. Of

11 course they do a good job of tracking the language, the

12 elements of the cause of action, but there's no specific

13 intent. Where is it, Your Honor? I'll go look. I don't

14 think you have the specific intent to harm this plaintiff.

15 I think what you have is the intent, as the plaintiff

16 pleads throughout their complaint, to maximize profit and

17 operate as a pure profit center; and maximizing profit, of

18 course, is a reasonable business objective that many

19 courts in New Jersey have held to be the case and can't

20 support an implied covenant claim. That's *Urbino*, *Faistl*,

21 *Hassler*, *Wilson*.

22 THE COURT: An implied covenant claim is that

23 Viridian took actions that it intentionally made in order

24 to frustrate the reasonable expectations of Mr. Steketee

25 under their agreement. So the reasonable expectation is

1    I'm going to get a price that's linked to wholesale market

2    conditions, and we have allegations that Viridian

3    intentionally charged four to five times that.  I don't

4    understand how that isn't sufficient.  It may not be

5    something that they can prove at trial, but why isn't that

6    a sufficient allegation of a covenant claim?

7              MR. BLYNN:  Because it's no different than the

8    *Hassler v. Sovereign Bank* case, the Third Circuit case

9    where the complaint repeatedly asserted the unlawful

10   nature of the bank not crediting deposits and debits in a

11   chronological order and in doing so caused several

12   overdraft fees to be incurred by the plaintiff.  But there

13   the Court said that allegation, that's unlawful act, but

14   there's no intention of doing anything other than simply

15   seeking profit, simply seeking to get more and more

16   revenue from overdraft charges.  That's why, Your Honor.

17             THE COURT:  Well, here I think we have a lot

18   more.  We have allegations of fraud, patently false

19   statements --

20             MR. BLYNN:  Unlawful acts.

21             THE COURT:  -- unlawful acts --

22             MR. BLYNN:  Yes.

23             THE COURT:  -- right?

24             MR. BLYNN:  Just like in *Hassler*, *Urbino* and

25   *Faistl*.  They do -- I applaud the plaintiffs; they do a

1 great job of tracking the elements of the cause of action.

2 What's lacking are the facts supporting those claims.

3    THE COURT:  So can I draw a reasonable inference

4 that the actions taken by Viridian in increasing prices

5 were intentional?

6    MR. BLYNN:  Increasing --

7    THE COURT:  They weren't by accident.  This

8 didn't happen by a random act.  It was --

9    MR. BLYNN:  No.

10    THE COURT:  -- an intentional act to charge more

11 than the plaintiff was told he would be charged.

12    MR. BLYNN:  Well, to increase its prices, yes,

13 of course it was an intentional action to --

14    THE COURT:  Right.

15    MR. BLYNN:  -- decide to increase its price a

16 fraction of a penny --

17    THE COURT:  Right.

18    MR. BLYNN:  -- of course.

19    THE COURT:  This is not just increasing prices,

20 though.  This is increasing prices as compared to what the

21 plaintiff reasonably understood the prices would be.

22    MR. BLYNN:  And that may even be the case, Your

23 Honor, but what's missing is the malice, the intention of

24 hurting -- of harming this plaintiff or any other

25 consumer.

1          THE COURT:  Well, it's bad faith.  It doesn't
2    have to be -- Viridian doesn't have to have a memo that
3    says, Let's really screw Steketee.
4          MR. BLYNN:  No, of course not.
5          THE COURT:  No.  What they have to have is bad
6    faith.  The bad faith here, I think, permeates the
7    complaint.  The bad faith is you gave me a teaser rate,
8    sucked me in and then milked me, month after month, until
9    I finally gave up and left.  And that was contrary to my
10   reasonable expectations under the contract.  So whether
11   there's a formal breach of contract or not, what you did
12   is sufficiently wrongful and in bad faith that I get a
13   cause of action.
14         MR. BLYNN:  I think it's different, Your Honor.
15   I think that the intention of raising rates was to, at
16   best, increase profits.
17         THE COURT:  Doesn't matter.
18         MR. BLYNN:  It does matter.  That's --
19         THE COURT:  It does not matter.
20         MR. BLYNN:  Seeking profits is not evidence of
21   bad faith.  That's New Jersey law.
22         THE COURT:  No, you're misstating New Jersey
23   law.  You can't simply say that because the harm you
24   inflicted was monetary and reflects back into our coffers
25   as profits that we're immune from a cause of action.

1    That's not what New Jersey law says.

2              MR. BLYNN:  Here's New Jersey law, Your Honor,

3    stated by the Third Circuit:  The complaint repeatedly

4    asserts the unlawful nature of defendant's acts but is

5    silent on its intention in doing so other than simply

6    seeking profit.

7              That's exactly what I'm saying.

8              THE COURT:  Right.  Here we've got allegations,

9    don't we, of bad faith?   This was done in bad faith.

10             MR. BLYNN:  We have the word "bad faith," but we

11   don't have the facts supporting it.  We don't have what

12   was involved in *Wilson* or the facts in *Slack*.

13             THE COURT:  They're implied.  When you go four

14   to five times the wholesale market rate, this is not

15   somebody squeezing a little bit more money out, this is --

16   to get more profit.  This is somebody who is intentionally

17   taking advantage of a consumer.  That's the allegations of

18   the complaint here.

19             MR. BLYNN:  But, Your Honor, the three to four

20   times the wholesale price --

21             THE COURT:  Okay.

22             MR. BLYNN:  -- we're back to the wholesale price

23   being irrelevant.  It doesn't matter how much higher the

24   wholesale price is.

25             THE COURT:  All right.

1          MR. BLYNN:  This consumer entered into the

2     contract with it being multiples higher -- his price being

3     multiples higher than the wholesale price anyway.

4          THE COURT:  Well, okay.  I thought it was a

5     pretty good claim before.  I haven't changed my mind, and

6     so --

7          MR. BLYNN:  Okay.

8          THE COURT:    -- obviously this one is going to

9     be --

10          MR. BLYNN:  I mean --

11          THE COURT:  -- dismissed.

12          MR. BLYNN:  If it hasn't changed, I don't

13     understand why -- why it was dismissed in the first place.

14          THE COURT:  It was dismissed without prejudice

15     to allow them, if they chose to, to supplement it.  I

16     could have said, Well, I'll dismiss count one but not

17     count two or maybe count three.

18          Dismiss the whole thing.  You're going to have

19     to replead anyway.  Dismiss the whole thing without

20     prejudice, come back and give me an amended complaint.  I

21     don't want to be referring back to complaint number one on

22     count two and complaint number two on count three.  I want

23     it in a single document.  Dismiss it without prejudice,

24     come on back and give me another complaint.

25          MR. BLYNN:  Okay.  And then, Your Honor, moving

1   into the last -- to the alternative argument, motion to

2   strike their class allegations, this is --

3            THE COURT:  Why is that not an issue for a class

4   certification motion?  In other words, all you're saying

5   is they can't certify a class, so why is that not

6   premature?

7            MR. BLYNN:  It's not premature because there's

8   plenty of authority that you can raise it.  When the face

9   of the complaint shows the class cannot be certified,

10  plaintiffs don't get a pass to excessive or to extreme and

11  burdensome, expensive discovery just to get the class

12  certification.  I mean, I have to explain to my client why

13  my bills are so high because I'm reviewing thousands upon

14  thousands of documents.  When the facts -- when the face

15  of this complaint and the complaints from the other cases,

16  which the Court can take judicial notice of, show that not

17  a single consumer received a common message, in fact, not

18  even two New Jersey consumers received a common message,

19  this plaintiff and Kulesa from -- from the Hembling

20  litigation.

21           THE COURT:  So it's not a common contract?

22           MR. BLYNN:  Your Honor, the contract -- in

23  fact -- in fact, Your Honor, I'm not sure it is.  There's

24  plenty of evidence that the contracts across Viridian

25  changed dramatically.  You can look at *Daniyan*, which says

1   nothing about --

2           THE COURT:  So Viridian doesn't have to get its

3   contract approved by the state DPUC?

4           MR. BLYNN:  No.  It submits its contracts

5   to the --

6           THE COURT:  Can it use them without approval?

7   Can they change them at a whim without approval and send a

8   different contract to every consumer?

9           MR. BLYNN:  I'm not sure.  Your Honor, I'm not

10  sure.  I don't -- I don't think it can, but the problem

11  is, you have consumers that received different iterations

12  of the contract.  So that's not --

13          THE COURT:  That's what we call subclasses.  So

14  the folks who had this contract are in subclass one, and

15  the folks who have that contract are in subclass two.  The

16  point is, the contract is a standard form contract, isn't

17  it?

18          MR. BLYNN:  That may be the case, Your Honor,

19  but that's not what caused this plaintiff or any other

20  plaintiff to enroll.  Just because there's a

21  representation in something that plaintiffs find later

22  doesn't mean a class can be certified.  You have oral

23  misrepresentations, and this is the *Broussard* case, Your

24  Honor.  There the Court said, you know, there are oral

25  misrepresentations, and even though there is a standard

1    contract, that doesn't -- that doesn't cut it.

2            THE COURT:  So perhaps you'll win the motion for

3    class certification, but the question of whether common

4    issues prevail or there are individual problems with the

5    proposed class representative is a classic Rule 23 issue.

6            MR. BLYNN:  Then, Your Honor, I'll make the oral

7    motion and treat this as a preemptive motion to decertify

8    the class, which is perfectly permissible.  I mean, it

9    doesn't matter.  I mean, we'll just file the same thing

10   tomorrow.  The point -- the point is, Your Honor, there's

11   no need to engage in any discovery or get to certification

12   because you have many different representations that were

13   received and --

14           THE COURT:  You're asking me, sir, to find as a

15   matter of law things that are not alleged in the

16   complaint.  You're asking me to strike a class allegation

17   based upon what you propose the facts are going to show.

18   I can't do that.

19           MR. BLYNN:  No, Your Honor, I'm not proposing --

20   I'm not proposing anything.

21           THE COURT:  You just told me --

22           MR. BLYNN:  You have --

23           THE COURT:  You just told me different

24   representations were made to different plaintiffs.  Where

25   is that in the complaint?

1          MR. BLYNN:  It's in the complaints in other

2    cases, which this Court can take judicial notice of.

3    We've provided, we've provided those as exhibits.

4          THE COURT:  Okay.

5          MR. BLYNN:  I mean, this is the problem, is this

6    is a unique case.  This is not the kind of case where you

7    have to go out and wait until after discovery to find that

8    consumers received different messages.

9          THE COURT:  If different messages are set forth

10   in the different complaints, does that mean a class cannot

11   be certified?

12         MR. BLYNN:  That's precisely what that means.

13         THE COURT:  I don't think so.  In other words,

14   the allegations in these complaints do not have to be

15   identical.  They can phrase what happened slightly

16   differently and get to the same point.

17         MR. BLYNN:  If the representations are, you

18   know, are not identical but are similar, but you don't --

19   what's missing, what's missing --

20         THE COURT:  So the class complaint in Case A and

21   the class complaint in Case B can represent different

22   classes.  So if there's a group of people who are told "X"

23   and a group of people who are told "Y," those can be

24   different classes in this case or in two different cases.

25   There's nothing that bars class certification simply

1  because there might be another subclass out there.

2         MR. BLYNN:  Your Honor, the problem --

3  theoretically I would agree.  The problem is, to determine

4  who received representation A and representation B, these

5  oral representations, the only way you could possibly

6  determine that is by mini trials, which would create

7  individualized issues swamping for dominance.

8         THE COURT:  And so you may win.

9         MR. BLYNN:  This is --

10         THE COURT:  And so you may win.

11         MR. BLYNN:  Well, this is -- your Honor, this is

12  more.  This is Judge Sotomayor in the Second Circuit

13  saying oral misrepresentation cases are -- oral

14  misrepresentations are presumptively individualized and

15  virtually never appropriate for certification,

16  regardless --

17         THE COURT:  Paragraph 23:  Viridian represents

18  that its variable rate plan is based upon market

19  conditions, period.  Indeed, that is the entire hook by

20  which Viridian attracts customers to variable rate plans,

21  period.

22         Is there any reason why I can't certify a class

23  of people to whom a representation was made that the

24  variable rate plan would be based upon market conditions?

25         MR. BLYNN:  Yes.

1          THE COURT:  Why?

2          MR. BLYNN:  Because, Your Honor, to find out who

3    belongs in that class you have to ask this plaintiff,

4    "What did you hear?"  You have to ask Plaintiff Kulesa in

5    the Hembling case --

6          THE COURT:  No.  There's --

7          MR. BLYNN:  Yes.

8          THE COURT:  There's no statement here that --

9          MR. BLYNN:  But, Your Honor --

10          THE COURT:  -- Viridian orally represents.  It's

11    simply "represents."

12          MR. BLYNN:  Well, but --

13          THE COURT:  If they're sent letters, if they're

14    sent flyers, if they're orally represented, the fact that

15    they received a representation that the rate plan would be

16    based upon market conditions is what makes it a class.  It

17    doesn't matter the form of the representation, does it?

18          MR. BLYNN:  Yes, yes.

19          THE COURT:  Is there case law that says --

20          MR. BLYNN:  Yes, Your Honor, sure.  There's

21    *Moore*, *Broussard*.  There's the recent Eastern -- Southern

22    District of New York case --

23          THE COURT:  So I could not certify a class of

24    people who received that representation if some of the

25    people received it in a flyer and some of the people

1 received it in a letter?  I couldn't do that?  It would be

2 unlawful for me to do that?

3          MR. BLYNN:  No.  You -- you could, Your Honor,

4 if there were no oral representations.  The problem is --

5          THE COURT:  Oh, so if somebody got a letter and

6 a representation on the phone, then they'd be excluded

7 from the class because the fact that they got a letter and

8 an oral representation makes them somehow different than

9 anybody else?

10          MR. BLYNN:  I think it would matter -- I think

11 it would matter incredibly when that representation was

12 received, because here if an oral representation was made

13 and that's what caused someone to enroll, and then later

14 they get the disclosure statement or they get the contract

15 that has the uniform representation, that's different.

16 The problem is, Your Honor -- and you don't have to look

17 any further than this case and *Hembling* -- you have a New

18 Jersey plaintiff who would be a class member in this case

19 because they've pled a New Jersey class who said, I

20 received -- I received a representation that I would

21 receive savings, period.  I didn't receive the

22 representation that my rate would be based on wholesale

23 market conditions.

24          THE COURT:  So that's in the allegation --

25 that's in the complaint, I did not receive a

1  representation?

2         MR. BLYNN:  No, Your Honor.

3         THE COURT:  So how do we know?  The point is, if

4  I certify a class of people who --

5         MR. BLYNN:  This -- I think we're having kind

6  of -- how do you know is because you have to -- you have

7  to conduct mini trials to find out what --

8         THE COURT:  No.

9         MR. BLYNN:  -- each person received.

10        THE COURT:  No, no, no.  You define the class,

11 and then you require the class members to certify, when

12 they get the class materials, "I received a

13 representation."  It happens all the time.  You're saying

14 that there can be no class treatment of a fraud claim.

15        MR. BLYNN:  I'm saying --

16        THE COURT:  It happens all the time in

17 securities cases.  This is no different.  There's a claim

18 of a generalized misrepresentation, relied upon by people

19 to their detriment.  That's a classic class action.

20        MR. BLYNN:  Your Honor, in securities cases

21 there's a fraud on the market theory that allows that --

22        THE COURT:  Sometimes.

23        MR. BLYNN:  Okay, sometimes, but in no time does

24 the fraud on the market theory apply to consumer fraud act

25 cases.

1          THE COURT:  Okay.

2          MR. BLYNN:  And that's the distinction.

3          THE COURT:  Here's the problem.  You're asking

4    me to decertify a class that hasn't even had -- in a case

5    that there's not even a class certification motion yet.

6          MR. BLYNN:  But there doesn't have to be.  I

7    mean, there is -- there is a procedure for a defendant to

8    raise this, either in a motion to strike or in a separate

9    motion under Rule 23.

10          THE COURT:  And you have raised it.  I'm saying

11   it's premature.  Let's see what the discovery shows.

12   Maybe the discovery is going to show every single member

13   of this proposed class got the same representation.  That

14   would be unusual, wouldn't it, in a case involving a

15   utility that they might send the same thing to all

16   prospective customers?  How -- how surprising.

17          MR. BLYNN:  Honestly, Your Honor, it would be

18   shocking here.

19          THE COURT:  Shocking.

20          MR. BLYNN:  It would be absolutely shocking

21   because of the allegations that we have in all the other

22   cases.

23          THE COURT:  Well --

24          MR. BLYNN:  We know that consumers enrolled for

25   a variety of reasons, such as what Your Honor pointed out

1    on August 18.  If someone likes the letter "V" and is from

2    Virginia and signed up with Viridian, that doesn't make

3    the case.  We have a consumer in one of the other cases

4    who said, I enrolled with Viridian because a friend was

5    selling it.  Boom, that's it.  There's --

6                THE COURT:  So that person gets excluded from my

7    class.

8                MR. BLYNN:  But how do you find -- this is the

9    concept, Your Honor:  To determine who is in and who's not

10   in the class, you have to engage in individualized

11   inquiry.

12               THE COURT:  Right, following discovery.  The

13   only individual I have is Mr. Steketee.  I can't assume

14   that some other plaintiff in some other case that made

15   some other allegation is going to be excluded from this

16   class.  I don't have the ability to do that, period.  The

17   fact that they make a different allegation doesn't mean

18   they will be excluded from this class.  They might be.

19               MR. BLYNN:  Okay.  And the last point on the

20   motion to strike, Your Honor, is we've got -- it's all

21   based on implied claim that wholesale market conditions

22   are wholesale market rates and nothing more because all

23   other rates are fixed.  The *Gillis* case, Your Honor, that

24   refused to certify --

25               THE COURT:  What else could wholesale market

1    conditions mean to the reasonable consumer other than

2    wholesale market cost?

3         MR. BLYNN:  Your Honor, I don't know, but that's

4    the point.

5         THE COURT:  If you can't even articulate what it

6    might mean, doesn't that at least permit a reasonable

7    inference that it means price?

8         MR. BLYNN:  It could -- it could mean price,

9    Your Honor.  It might mean something else.

10        THE COURT:  And I've got to take the complaint

11   and draw all reasonable inferences in favor of the

12   plaintiff.  We went through this last time.

13        MR. BLYNN:  But, Your Honor, I'm talking about a

14   motion to strike here, and the *Gillis* case came out and

15   said, Okay, here's the disclosure statement, a uniform --

16   admittedly uniform document that every class member got,

17   proposed class member got included a statement about -- I

18   think it was Respond Energy -- about Respond Energy's

19   variable rates, and the plaintiff there said that is an

20   implied representation that there's a rate cap.  Even

21   though the agreement doesn't provide for a rate cap, it

22   necessarily means it's a rate cap.  It's an implied claim.

23        And the Court said, The only way -- I'm not

24   going to certify a class.  The only way to determine what

25   each consumer took from this is through parol or extrinsic

1  evidence, which --

2      THE COURT:  Here's the problem.  That may be

3  true in that case.  In this case, you can't articulate

4  what "wholesale market conditions" means other than

5  wholesale market price.  If you can't even come up with a

6  theory why it means something other than price, it's a

7  reasonable inference by definition.

8      MR. BLYNN:  Well, "wholesale market conditions"

9  could mean the fact that generator -- the viability of

10 generators in the market, you know, which went offline in

11 2014.  There are -- "conditions" is a broader --

12     THE COURT:  So how would that affect an

13 individual consumer's price other than through a change in

14 the wholesale market price?  A generator goes offline.

15 That's a new condition.  What happens to the price?  It

16 goes up.  There's less supply.  Oh, so wholesale price

17 goes up, so my price will go up.

18     Is there any other condition that isn't going to

19 factor back to the consumer in the form of price?  The

20 only thing the consumer is doing is buying electricity.

21 The consumer is not putting it on or admiring the

22 qualities of the electricity.  It's a commodity to them.

23 The fact that it may be green energy is one thing, but

24 when it comes to their home, it's a commodity, and all

25 they care about is the price.  So when somebody says

1    "wholesale market conditions," a hundred percent of

2    consumers are going to read that as wholesale market

3    price.

4            MR. BLYNN:  I guess we'll find out, Your Honor.

5    It sounds like we're going to discovery on this anyway, so

6    we'll find out.  I just hope that when it comes to -- at

7    the end that we can recover some of our costs because

8    discovery is very expensive in these cases.

9            THE COURT:  Right.

10           MR. BLYNN:  Thank you, Your Honor.

11           THE COURT:  Thank you.  Mr. Izard?

12           MR. IZARD:  I guess if the Court has any

13   questions, I'm happy to try to answer them.  If you wish

14   me to make a presentation, I'm happy to, whatever the

15   Court prefers.

16           THE COURT:  Well, I think I've shown my hand.

17           MR. IZARD:  Right.  That's why I figured it

18   might be safest to be quiet.

19           MR. BLYNN:  That's the strongest argument I've

20   ever heard.

21           THE COURT:  Yes.  So, I mean, it's not a perfect

22   complaint, and whether you can prove these things, whether

23   you can overcome these hurdles eventually, I don't know,

24   but I think it's sufficient to overcome the motion to

25   dismiss and the motion to strike, which I'm going to deny,

1   substantially for the reasons I think I've set forth in

2   excruciating detail already.  If anybody wants me to say

3   more, I will, but...

4               MR. IZARD:  No, Your Honor.

5               MR. BLYNN:  No, Your Honor.

6               THE COURT:  All right.  Where do things stand on

7   the case?

8               MR. IZARD:  Your Honor, we -- I received --

9   frankly, the document discovery is about done.  We're

10  waiting on --

11              MR. BLYNN:  I think you're talking about

12  Sanborn.

13              MR. IZARD:  Excuse me, I'm mixing it up with the

14  Connecticut Viridian case.  In this case we're moving to

15  discovery, but based on the work in the Sanborn case,

16  we're getting a good sense of the type of records that are

17  kept.  We have an expert who's putting together a model,

18  so it seems to me if we can get the same kind of data in

19  this case we can move along pretty quickly because it's

20  the same company, so the records should be similar, the

21  analysis should be similar.

22              MR. BLYNN:  Again, we're just dealing with a

23  different state, but I agree, I think the records probably

24  are similar, and I think a lot of the discovery will

25  overlap, so I think we're probably ready to move to class

1    certification very quickly.

2            MR. IZARD:  I know in Sanborn, as I say, we've

3    noticed a 30(b)(6), we're working out a date, but in

4    Sanborn we hope we'll be able to file a motion for class

5    certification at least in January, and this case should

6    follow shortly thereafter.

7            THE COURT:  All right, do me a favor.  I didn't

8    go back to look at the current scheduling order.  Let's

9    just make sure that whatever the schedule is, it's

10   appropriate, and if it's not, the two of you ought to

11   confer and propose a different schedule.  I think it would

12   be helpful to bring on the class cert motions at the

13   earliest reasonable point, so maybe the two of you can

14   discuss that.

15           MR. BLYNN:  I don't think a schedule has been

16   issued in this case yet, Steketee, so why don't we confer

17   on this, and we'll come up with a schedule.

18           MR. IZARD:  And particularly once we finish up

19   the 30(b)(6) in Sanborn, they've got to really give us a

20   clear road map as to what follow-up information we need

21   and what the schedule can be here.

22           THE COURT:  Well, let me just inquire whether

23   you can do a single 30(b)(6).

24           MR. BLYNN:  That's what I was going to suggest.

25   Maybe we can consolidate the classes or the cases for

1  discovery purposes.

2          THE COURT:  Or even just agree amongst

3  yourselves that the 30(b)(6) can be used in both cases.

4          MR. IZARD:  Yes.

5          MR. BLYNN:  Yes.

6          THE COURT:  In other words, it doesn't make a

7  lot of sense to ask the same questions twice.

8          MR. IZARD:  Oh, absolutely.  My only issue with

9  consolidating is New Jersey is not in New England, so

10  there's a whole different rate administrator structure and

11  all that stuff, so --

12          THE COURT:  Well, I'm not saying it's a hundred

13  percent overlap, but you can save a lot of time, I

14  think --

15          MR. IZARD:  Absolutely.

16          THE COURT:  -- if you just agree.

17          MR. IZARD:  Absolutely.

18          MR. BLYNN:  It's fine with us.

19          THE COURT:  Okay.  And from the defense point of

20  view, what discovery, if any, do you still need?

21          MR. BLYNN:  Your Honor, we served -- well, in

22  Steketee discovery hasn't started yet for either party.

23  In Sanborn we served some -- our first sets of discovery

24  back in, I think, the beginning of October -- I'm sorry --

25  yes, the beginning of October.  We haven't gotten the

1   responses yet, but we've been working with Mr. -- with

2   Attorney Izard's colleague, and we've been agreeing to

3   extensions.  I expect -- I think the deadline, the new

4   deadline is either Monday or this Friday, I forget, so we

5   should be getting documents and some interrogatory

6   responses, and then we'll schedule depositions.  I think

7   fact discovery in Sanborn closes February 1, so the

8   parties are working towards meeting that, and if we have

9   any issues, we'll let the Court know.

10          THE COURT:  Okay, all right.  So I'll look for a

11  proposed scheduling order in this case, what, in --

12          MR. BLYNN:  Correct.

13          THE COURT:  -- two weeks?  Is that plenty of

14  time?

15          MR. IZARD:  Yes.

16          MR. BLYNN:  Yes, I think that's fine.

17          THE COURT:  All right, good luck.  We'll stand

18  in recess.

19          (Whereupon, the proceedings were adjourned at

20  12:43 p.m.)

21

22

23

24

25

C E R T I F I C A T E

I, Sharon L. Masse, RMR, CRR, Official Court Reporter for the United States District Court for the District of Connecticut, do hereby certify that the foregoing pages are a true and accurate transcription of my shorthand notes taken in the aforementioned matter to the best of my skill and ability.

February 8, 2016

/S/ Sharon L. Masse
Sharon L. Masse, RMR, CRR
Official Court Reporter
915 Lafayette Boulevard
Bridgeport, Connecticut  06604
Tel: (860)937-4177